# UNITED STATES DISTRICT COURT
## FOR THE DISTRICT OF VERMONT

```
UNITED STATES OF AMERICA      :
                              :
v.                            :        No.  2:13-cr-40-2
                              :
JONATHAN STEWART,             :
                              :
          Defendant.          :
```

## MEMORANDUM OPINION AND ORDER

Defendant Jonathan Stewart is charged with one count of conspiracy to distribute heroin in violation of 21 U.S.C. §§ 841(a), 846.  Stewart moved to sever his trial from that of his co-defendant, Aaron Gray.  Stewart also seeks to suppress statements made to the Burlington Police Department and physical evidence collected based on those statements.  For the reasons set forth below, this Court **denies** Stewart's requests.


## BACKGROUND

Beginning in mid-December 2012, the Burlington Police Department ("BPD") investigated a group of individuals from Philadelphia, Pennsylvania suspected of distributing drugs in the Burlington area.  Aaron Gray, or "Pop," Stewart's cousin and co-defendant in this case, was the suspected leader of the group.  The BPD used a Confidential Informant ("CI") to make four controlled buys from Gray's group.  During two of the four purchases, the CI met directly with Gray.  Each time the CI

purchased ten bags of a substance that tested presumptively positive for heroin.

On January 4, 2013, acting on a tip from the CI, the BPD observed Stewart arrive in Burlington on a bus from Philadelphia. The CI had heard from a source that a courier, reportedly Gray's cousin, would be arriving on the MegaBus at UVM at 2:45 p.m. The source intended to pick Stewart up at the bus stop.

In preparation for the courier's arrival, the BPD obtained a warrant for a residence at 96 Pitkin Street. The investigation of "Pop" had revealed that Gray stayed at Apartment A at that address while in Burlington. A warrant issued by a Vermont Superior Court authorized the search of the apartment including "all of its contents and containers locked and unlocked." Opp'n Ex. C, at 1, ECF No. 26-3. Officers also set up surveillance of the MegaBus stop, planning to intercept the courier and his ride while simultaneously executing the search warrant.

The BPD had no description of the courier; they had planned on identifying him as he met his ride. When the expected individual failed to arrive to pick up the courier, officers began watching for someone without luggage who appeared to be looking for a ride. Detective Volp noticed a man later identified as Stewart wearing a dark-colored backpack with no

other luggage and speaking on a cell phone. About fifteen minutes later Stewart got in a taxi. Officers followed Stewart's taxi to the residence at 96 Pitkin Street, where Stewart entered Apartment A.

Shortly after Stewart entered the residence, BPD officers executed the warrant. An estimated eight to ten officers assembled about two blocks away and prepared to enter the building. ATF surveillance had previously seen Gray exit the apartment, and Gray returned while the officers approached. He spotted the BPD and fled. Officers gave chase and eventually apprehended Gray. Stewart was left behind in the apartment.

The remaining officers entered the apartment through the unlocked front door, led by Lieutenant Sullivan (then-Detective Sergeant, assigned to supervise the drug unit). Officers swept the apartment and detained Stewart upon finding him in the residence along with two other individuals. The individuals were secured in handcuffs pursuant to standard procedure.

Sergeant LaBarge approached Stewart sometime after he had been secured. Stewart sat handcuffed on a couch in a small living room attended by two detectives. LaBarge told Stewart that he was detained but not under arrest. Sergeant LaBarge also told Stewart that he would not ask any incriminating questions; he just wanted Stewart to listen to what he said. LaBarge informed Stewart that BPD had probable cause to believe

he might be in possession of drugs. LaBarge then asked Stewart
if he would consent to a search of his person, his backpack, and
any items he brought with him. Sergeant LaBarge explained that
if Stewart did not consent, a search warrant would have to be
obtained from a judge. Stewart agreed to the search.

After learning that Stewart intended to consent to a
search, Sergeant LaBarge activated a recorder. He noted the
time as 3:55 p.m., took down Stewart's basic information, and
confirmed the conversation that had just occurred. The
transcript indicates that Stewart agreed with LaBarge's
characterization of the conversation, including that Stewart had
agreed to give his free and voluntary consent to a search of his
person, backpack, and any items he brought with him. Sergeant
LaBarge explained that consenting to the search would be "one
hundred percent [Stewart's] choice." Opp'n Ex. A, at 3, ECF No.
26-1. Then LaBarge reviewed the written consent form with
Stewart. Before signing the form, Stewart asked whether he
could go home afterward. LaBarge at first appeared to answer in
the affirmative, but then clarified his response by stating that
he could make no promises, but they would "take it step by
step." Opp'n Ex. A, at 4, ECF No. 26-1. Stewart proceeded to
sign the consent form at 4 p.m.

As LaBarge began to search Stewart's person, Lieutenant
Sullivan approached and asked Sergeant LaBarge, "Where's his

backpack?" Opp'n Ex. A, at 6, ECF No. 26-1. Sullivan had been standing nearby during LaBarge and Stewart's conversation. Sullivan testified that he saw a backpack in the living room that he assumed belonged to Stewart, but he asked Sergeant LaBarge to verify that the backpack in view was the one LaBarge had gotten consent to search. At that time, Stewart voluntarily indicated that his backpack was "right next to" Lieutenant. Sullivan. Opp'n Ex. A, at 6, ECF No. 26-1. The exchange and the entire search were recorded. The record indicates that the search concluded at 4:06 p.m. *Id.*

After confirming that the backpack belonged to Stewart, Lieutenant Sullivan searched the backpack. He found some personal effects along with plastic bags full of wax bags that later proved to contain heroin. Detective Volp testified that he saw the heroin being removed from the backpack and positively identified the bag as the pack he saw Stewart carrying at the bus stop. Detective Volp had stood within four feet of Stewart at the bus stop. Police seized the heroin, but the backpack was not seized.

Once police brought Stewart to the station, he refused to speak to them. Gray, however, told an officer in a post-arrest interview that "as you know, Jon brought" what the officer referred to as "the stuff" up to Burlington. Mot. to Sever 2, ECF No. 22. Gray confirmed that "Jon" (Stewart) was his "usual

guy" and his "usual courier." *Id.* He indicated that he used Stewart three or four times to transport heroin to Burlington for sale.

## DISCUSSION

Stewart filed a motion to sever on the grounds that the introduction of Gray's statements at their joint trial would implicate Stewart in violation of the Sixth Amendment. He claims that jury instructions or redaction would be inadequate to cure the prejudice created by introducing Gray's statements. Therefore, Stewart requests severance of his trial from that of his co-defendant. Stewart also wishes to suppress statements and physical evidence from the time when he was detained by police in Gray's apartment. Stewart claims that any statements he made and his consent to the search of his person and belongings were involuntary and in violation of the Fifth Amendment.

## I. Motion to Sever

Federal Rule of Criminal Procedure 8(b) allows defendants to be tried together "if they are alleged to have participated in the same act or transaction, or in the same series of acts or transactions, constituting an offense or offenses." Fed. R. Civ. P. 8(b). "There is a preference in the federal system for joint trials of defendants who are indicted together." *Zafiro*

*v. United States*, 506 U.S. 534, 537 (1993). Federal policy also favors joint trials when "the underlying crime involves a common plan or scheme." *United States v. Cardascia*, 951 F.2d 474, 482 (2d Cir. 1991).

Joint trials "play a vital role in the criminal justice system." *Zafiro*, 506 U.S. at 537 (quoting *Richardson v. Marsh*, 481 U.S. 200, 209 (1987)). Joint trials promote efficiency and "serve the interests of justice" by avoiding inconsistent verdicts. *Id.* (quoting *Richardson*, 481 U.S. at 210). The Court may grant severance of the defendants, or whatever relief justice requires, if the joinder appears to prejudice a defendant or the government. Fed. R. Crim. P. 14(a). A defendant requesting severance bears a burden of demonstrating "so severe a prejudice that [he is] effectively denied a fair trial." *United States v. Washington*, 819 F. Supp. 358, 363 (D. Vt. 1993) (citing *Cardascia*, 951 F.2d at 482; *United States v. Taft*, 769 F. Supp. 1295, 1312 (D. Vt. 1991)).

Here, Stewart and Gray are charged with conspiracy to distribute heroin in the same indictment. Clearly, policy considerations favor that they be tried jointly. Stewart argues, however, that Gray made statements to police that will improperly implicate Stewart if introduced against Gray at trial. He claimed that relief other than severance would be inadequate because jury instructions or redaction would not

prevent the jury from inferring Stewart's guilt from Gray's statements.

Gray's statements made in his post-arrest interview may not be introduced against Stewart at trial unless Gray testifies directly against Stewart. If Gray does not testify, the introduction of his statements would violate Stewart's Sixth Amendment right to confrontation through cross-examination. *See Bruton v. United States*, 391 U.S. 123 (1968). *Bruton* held that if a co-defendant's statements inculpating a defendant are offered into evidence against the co-defendant, and if the co-defendant has invoked his privilege to refuse to testify, then the defendant's inability to cross-examine his co-defendant violates the defendant's confrontation rights. *Id.* at 127–28.

Although Federal Rule of Criminal Procedure 14 permits severance to avoid prejudice, the Rule does not require it. Other remedies may be appropriate and Rule 14 leaves the tailoring of the relief to be granted to the Court's sound discretion. *Zafiro*, 506 U.S. at 538–39. In *Bruton*, the Court recognized the difficulty in expecting a jury to consider evidence against one codefendant but not the other. 391 U.S. at 131–32. Often, limiting instructions cannot eliminate the potential for prejudice. *Id.* A redacted statement, however, may cure the problem. See *United States v. Harris*, 167 Fed.

Appx. 856, 859 (allowing admission of a redacted post-arrest statement against a non-declarant defendant in a joint trial).

In this case, the decision about whether Gray's statements can be redacted is premature. If Stewart and Gray go to trial together, then the Court will individually assess any prejudicial statements for the possibility of redaction.

## II. Motions to Suppress

### A. Statements Made Prior to *Miranda* Warnings

During Stewart's detention in the apartment he made certain statements indicating that he owned a backpack that was found to contain heroin. Stewart seeks to suppress his statements and the resulting physical evidence because of the allegedly involuntary nature of the statements he made prior to the administration of *Miranda* warnings. Stewart argues that his detention in the apartment amounted to being in custody and any questioning by police should be considered an unwarned custodial interrogation. Mot. to Suppress 5, ECF No. 22.

The Government concedes that Stewart was in custody, but contends that his Fifth Amendment rights were not violated because police did not interrogate him. Opp'n 8–9, ECF No. 26. The Fifth Amendment requires the procedural safeguards of *Miranda* warnings only when police attempt to interrogate a subject in custody. *Rhode Island v. Innis*, 446 U.S. 291, 300 (1980). An interrogation refers to either express questioning

of the person in custody or the functional equivalent—words or actions that the police should know "are reasonably likely to elicit an incriminating response from the suspect." *Id.* at 301. To protect against police coercion, the perceptions of the suspect, and not the intent of the police, must be analyzed. *Id.*

When a defendant offers information to the police, *Miranda* warnings are not required because "[v]olunteered statements of any kind are not barred by the Fifth Amendment." *United States v. Rommy*, 506 F.3d 108, 132 (2d Cir. 2007) (quoting *Miranda v. Arizona*, 384 U.S. 436, 478 (1966). When a defendant "initiates further communication," law enforcement may listen to any voluntary statements and use them against the defendant at trial. *Id.* Sometimes police may need to ask questions to clarify a volunteered statement. *Id.* at 132–33. In *Rommy*, the Second Circuit joined other circuits in concluding that in relation to voluntary statements "simple clarifying questions do not necessarily constitute interrogation." *Id.* at 133. The underlying facts must be analyzed to ensure that the follow-up questions did not seek to compel further incriminating statements. *Id.*

According to the recording, police officers did not expressly question Stewart about his backpack until after he had volunteered information. Opp'n Ex. A, at 6, ECF No. 26-1.

During Detective LaBarge's search of Stewart's person, Detective
Sullivan directed a question to Detective LaBarge asking,
"Where's his backpack?" *Id.* Officers had seen Stewart get off
the bus wearing a backpack, so they were aware he had one and
knew what it looked like. Opp'n 4, 10, ECF No. 26. The fact
that Sullivan asked LaBarge about the pack's location in the
presence of Stewart does not mean that he intended to coerce the
location from Stewart. Further, at the time the conversation
took place, Stewart had signed a consent form allowing the
search of his person, belongings, and backpack. Opp'n Ex. B,
ECF No. 26-2. Lieutenant Sullivan testified that he asked
Sergeant LaBarge about the backpack's location to verify that
the pack he had seen in the living room was the one that LaBarge
had gotten consent to search. Therefore, it is unlikely Stewart
would have perceived Lieutenant Sullivan's question to Sergeant
LaBarge as an attempt to elicit incriminating information.

Stewart argued that the entire situation at the apartment
created a coercive custodial setting, that being surrounded by
police while away from home and in another state meant that he
could not make a voluntary statement without being advised of
his rights. Mot. to Suppress 7, ECF No. 22. As stated above,
however, a custodial setting does not necessarily create a Fifth
Amendment violation when the suspect has not been advised of his
or her *Miranda* rights, unless the police's actions rise to the

level of an interrogation.  Police did not attempt to elicit any information from Stewart, so there was no interrogation.

Stewart volunteered the location of his backpack to Lieutenant Sullivan in response to Sullivan's question to Sergeant LaBarge.  Lieutenant Sullivan's follow-up questions—"Right here?" and "This black one right here?"—were merely clarifying questions that did not elicit any new information from Stewart.  Opp'n Ex. A, at 6, ECF No. 26-1.  As in *Rommy*, where police interrupted the defendant's narrative to ask questions to clarify the information he was providing, the questions here also did not transform the exchange into an interrogation.  506 F.3d at 134.  As a result, because Stewart's statements were voluntary and did not violate the Fifth Amendment, the physical evidence collected based on those statements was not tainted and will not be suppressed.

## B. Voluntariness of the Consent to Search

The Fourth Amendment protects private persons from unreasonable government searches in areas where they have a "legitimate expectation of privacy." *United States v. Snype*, 441 F3d 119, 130 (2d Cir. 2006).  Guests share their host's legitimate expectation of privacy.  *Id.*  The Fourth Amendment prohibits warrantless searches; however, an exception exists for searches conducted pursuant to consent from an authorized person.  *Id.*  That consent may not be explicitly or implicitly

coerced or obtained by threat.  *Id.* at 131.  The government has
the burden of proving voluntariness in the "totality of all the
circumstances."  *Id.*  "[T]he fact that a person is in custody or
has been subjected to a display of force does not automatically
preclude a finding of voluntariness."  *Id.*

Although the initial shock and confusion of the police's
entry into the apartment may have affected Stewart, the
atmosphere had calmed by the time Stewart signed the consent
form.  Sergeant LaBarge testified that Stewart was sitting alone
on the couch with a couple of detectives nearby when he
approached to speak with him, about half an hour after the
search began.[1]  Further, Sergeant LaBarge treated Stewart with
courtesy and ensured he knew that the choice to consent to a
search was entirely up to Stewart.  *See* Opp'n Ex. A, ECF No. 26-
1.  LaBarge informed Stewart that law enforcement had probable
cause to believe that he may be in possession of drugs.  Opp'n
4, ECF No. 26.  LaBarge obtained Stewart's consent to search his
person, backpack, and any items he arrived with, and then
reviewed that conversation once he started recording.  Opp'n Ex.
A, at 2-3, ECF No. 26-1. Stewart confirmed that he had indicated
he would be willing to give his "free and voluntary consent" and
that he stood by that decision.  *Id.* at 3.  Sergeant LaBarge

---

[1] Detective Volp testified that the Return of Service for the Search Warrant
indicated that the search began at approximately 3:24 p.m. and the recording
of Sergeant LaBarge's conversation with Stewart began at 3:55 p.m. Opp'n Ex.
A, at 1, ECF No. 26-1.

explained that the consent form stated that Stewart freely gave his permission for the search and that no threats or promises had been made to force the consent.  *Id.* at 3-4.  Stewart agreed and signed the consent form.  *Id.* at 4-5.  During the search of Stewart's person, Detective LaBarge told Stewart to let him know if he wanted the search to stop and continued to make sure Stewart knew the search was voluntary.  *Id.* 5-6.

Stewart argues that Detective LaBarge coerced his consent when Stewart asked if he could go home "[a]fter all this" and LaBarge responded that they would take things "step by step." Mot. to Suppress 10, ECF No. 22.  Contrary to Stewart's allegation that Detective LaBarge gave him the impression that he might be released if he gave his consent, the record reflects that LaBarge explicitly stated that he wouldn't promise Stewart anything.  Opp'n Ex. A, at 4, ECF No. 26-1.

In any event, law enforcement had a search warrant authorizing the search of the apartment and "all of its contents and containers locked and unlocked." Opp'n Ex. C, ECF No. 26-3. The nature of Stewart's consent to the search of his backpack is irrelevant because officers had the authority to search it without any consent.  The Court additionally finds, however, that Stewart freely and voluntarily gave his consent for the BPD to search his person, backpack, and belongings.  Therefore, Stewart's Motion to Suppress is denied.

**CONCLUSION**

For the aforementioned reasons, the Court **denies** Stewart's motion to sever and **denies** his motions to suppress statements and physical evidence.

Dated at Burlington, in the District of Vermont, this 16th day of October, 2013.

/s/William K. Sessions III
William K. Sessions III
U.S.  District Court Judge
